UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Crim. No. 3:03CR242(SRU) |
| | : | |
| v. | : | June 10, 2005 |
| | : | |
| **JOSE RIVERA** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

**I.      Introduction**

On August 26, 2003, a federal grand jury in Connecticut returned a one-count indictment charging the defendant with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).  A jury trial before this court began on March 8, 2004, and on March 10, 2004, a jury found the defendant guilty.

The Court held a sentencing hearing on May 28, 2004.  The government argued that (as the Presentence Report ("PSR") set forth) three of the defendant's past convictions rendered him an armed career criminal under 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4, and that the defendant should be sentenced to the guidelines range of 262-327 months.  The Court concluded that the Armed Career Criminal Act (the "ACCA") was not applicable, and instead sentenced the defendant to 120 months of imprisonment, to be followed by three years of supervised release.  The Court did not fine the defendant; he was ordered to pay a $100 special assessment.

The defendant appealed his conviction, and the government cross-appealed the Court's sentence.  Specifically, the government cross-appealed the Court's decision that the ACCA did not apply.

On April 6, 2005, the U.S. Court of Appeals for the Second Circuit issued a summary order affirming the defendant's conviction, vacating his sentence, and remanding for resentencing under the ACCA, 18 U.S.C. § 924(e).  The Court of Appeals agreed with the government that the defendant's prior conviction for first degree escape under Connecticut law constituted a violent felony under the ACCA, and that the defendant therefore should have been sentenced under the

ACCA. See United States v. Rivera, 04-3769(L), 2005 WL 767437, at * 3 (2d Cir. 2005) (concluding that "defendant must be resentenced under the ACCA").

Resentencing is scheduled for June 21, 2005. Based on the defendant's status as an armed career criminal and the fact that he possessed a sawed-off shotgun, the defendant's offense level under U.S.S.G. § 4B1.4(b)(3)(A) is 34. Under § 4B1.4(c)(2), the armed career criminal guideline, the defendant's criminal history category ("CHC") is automatically rendered to be VI. However, the defendant's extensive prior criminal record yielded 17 criminal history points, easily making him a "natural" CHC VI without any help from the automatic bump-up in § 4B1.4(c)(2). With an offense level of 34 and a CHC VI, the defendant's sentencing guidelines range is 262-327 months in prison. The government respectfully requests that the Court impose a sentence of imprisonment within the sentencing guidelines range.

## II.   The Offense Conduct and Other Trial Evidence

The evidence at trial showed that on the evening of March 4, 2003, members of the Gang Task Force of the Waterbury Police Department responded to a call that a gang fight was about to break out between the Los Solidos and the Latin Kings, two street gangs. Tr. 39-40; 104-05; 157-58. When the police arrived at the scene, they observed several males arguing and engaged in boisterous behavior on the front porch of 233 River Street in Waterbury. Tr. at 40; 110; 161-62. Three officers testified that, as they were exiting their vehicles and making their way to the building, they saw the defendant, Jose Rivera, and another individual, Raul Santiago, inside the entrance to the multi-unit apartment building, at the foot of the inside stairwell. Tr. at 42, 111; 162-63, 168. The building was known to the police as the Los Solidos house. Tr. 125. Each of the three officers testified that he saw Rivera holding a shotgun and Santiago holding a machete. Tr. at 42; 111; 162-63.

The officers testified that, when Rivera and Santiago saw the police, they fled up the internal flight of stairs and into an apartment at the top of the stairs. Tr. 42-43; 112-14; 163-64. The three officers chased the pair into the apartment, whereupon one of the officers pursued

Santiago into the kitchen, arrested him and seized the machete, while the other two officers pursued Rivera into a bedroom in the apartment. Tr. 48-49; 115; 164-65. The two officers saw the defendant trying to crawl under a bed. They dragged the defendant out from underneath the bed and seized the shotgun which he had been holding onto until the officers removed him from underneath the bed. Tr. 49-50; 165-67.

The police arrested Rivera and Santiago, Tr. 51-52; 115; 167, as well as the defendant's girlfriend, Luciana Rodriguez, and his sister, Elizabeth Rivera, for interfering with the police officers as they were trying to arrest the defendant and Santiago. Tr. 52; 118; 167-68.

The government also presented expert testimony that the shotgun had been manufactured in Massachusetts, and that the manufacturer had never manufactured guns in Connecticut. Tr. at 215. The shotgun itself contains engraved writing: "Savage Arms Corporation, Westfield, Massachusetts." Tr. at 213.

The defendant called three witnesses to testify. The first witness was the defendant's girlfriend, Luciana Rodriguez. Tr. 270. She testified that the police did not chase Rivera and Santiago up the stairwell of the building and into her apartment, as the police officers had testified. Tr. 293. Rather, she testified that Rivera and Santiago were in her apartment that evening prior to the time the police arrived; that Santiago left the apartment briefly to go downstairs; and that he returned to the apartment a short time later because the police had arrived. Rodriguez testified that she locked the door. The police then came to her door on the second floor a short time later, asking to speak to Santiago. Tr. 293-95; 325-28.

Rodriguez testified that after Santiago stepped into the hallway, the police officers asked about a jacket that belonged to the defendant and whether anyone else was in the apartment. Tr. 295-96; 331. According to Rodriguez, she lied and did not tell them that Rivera was in the apartment and that the jacket was his. Tr. 296-97; 331-32. According to Rodriguez, Rivera was in the apartment hiding in a closet because he had outstanding warrants for his arrest. Tr. 331.

Rodriguez testified that the police then looked through the apartment without her consent and found Rivera hiding in a closet.  Tr. 297.

Rodriguez testified on cross-examination that, after Rivera was found in her closet, she saw the police officers come out of her bedroom with the sawed-off shotgun.  Tr. 332.  She also testified that she saw the officers enter her bedroom and that they did not have the sawed-off shotgun when they entered her bedroom.  Tr. 332.  Rodriguez then testified that she found out from Rivera how the sawed-off shotgun had made its way into her apartment.  Tr. 332-33.  She testified that after Rivera's arrest, he told her that he was holding the shotgun for another individual, Edgardo Guzman.  Tr. 335-36.  Rodriguez admitted that she had testified previously (specifically, at the suppression hearing in this case) that she had no idea how the shotgun that the police seized had gotten into her apartment.  Tr. 333-34.  However, she testified repeatedly -- on cross-examination and redirect -- that she now knew that, based on Rivera's statements to her after his arrest, Rivera was keeping the shotgun in the apartment for Guzman.  Tr. 335-36; 352-57.

The defendant also called Virgin Alvarado to testify.  Tr. 361.  Alvarado, a 20-year friend of Luciana Rodriguez who lived next door to her, testified that she sold a bed frame to Luciana Rodriguez and that the frame was too close to the ground to fit under.  Tr. 362, 365, 369.  (Luciana Rodriguez had likewise testified that no one could fit under her bed because it was too close to the floor.  Tr. 292.)  But Alvarado tesified on cross-examination that Luciana Rodriguez had altered the bed frame since she sold it to her by removing the wheels from the bed, which made the bed closer to the floor.  Tr. 372-73.

Finally, the defendant called Juan Rodriguez, the boyfriend of the defendant's sister, Elizabeth Rivera.  Tr. 380, 383.  Juan Rodriguez testified that he had been a member of the Los Solidos gang, Tr. 405-06, and that he was with the shotgun's owner, Edgardo Guzman, also a gang member, when Guzman purchased the sawed-off shotgun from an unknown individual in Waterbury, Connecticut, just days before the police arrested Rivera on March 4, 2003.  Tr. 390-

92. Juan Rodriguez testified that the sawed-off shotgun was referred to as "baby." Tr. 388-90. He testified that on the day of Rivera's arrest, Guzman had asked Rodriguez to hold the shotgun for him but that he refused to do so, and that he did not see the shotgun again until the police brought it down from the second floor after they arrested Rivera. Tr. 393-94.

Contrary to Luciana Rodriguez's testimony, Juan Rodriguez testified that Jose Rivera was "on the bottom step" of the stairway in the building when the police arrived. Tr. 396. He also testified, contrary to Luciana Rodriguez's testimony, that Raul Santiago was also "standing in the doorway" when the police arrived. Tr. 399. He testified that after the police arrived, Rivera started to walk upstairs and Santiago "ran upstairs." Tr. 399. Juan Rodriguez testified, however, that Rivera was not carrying the sawed-off shotgun and that Santiago was not carrying a machete. Tr. at 399.

On cross-examination, Juan Rodriguez testified that the defendant had also been a member in the gang, and that the building at issue was a hangout for the Los Solidos gang. Tr. 416. Juan Rodriguez further admitted that the defendant's brother, Juan Rivera, had been the president of the gang, Tr. 432, and that membership in the Los Solidos gang required a loyalty oath, requiring a pledge of loyalty to your "family" -- i.e., the gang. Tr. 423-25.

### III. Sentencing in the Wake of *United States v. Booker*

In *United States v. Booker*, 125 S. Ct. 738, 2005 WL 50108 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." *Booker*, 125 S. Ct. at 756. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence

within the statutory maximum penalty for the offense of conviction. The sentence will be subject to appellate review for "reasonableness." *Id.* at 766.

The Court of Appeals for the Second Circuit has offered some initial guidance to sentencing courts on how to proceed with sentencings in the wake of *Booker*. In *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Court summarized the impact of *Booker* as follows:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). ***Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range,*** or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. ***Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence.*** Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

*Id.* at 113 (emphasis added).

In other words, a sentencing now involves two analytic stages: first, a determination of the applicable Guideline range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in § 3553(a), there is any reason to impose a non-Guidelines sentence.

As to Stage One, the applicable Guideline range "is normally to be determined in the same manner as before *Booker/Fanfan*." *Id.* at 112; *see id.* at 111. In limited circumstances, "precise calculation of the applicable Guidelines range may not be necessary" when a judge determines that either of two (not necessarily overlapping) ranges applies, and if "the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies." *Id.* Such may be true in cases involving "complicated matters, for example, determination of monetary loss," or "close questions . . . as to the precise meaning or application of a policy statement authorizing a departure." *Id.* In general, however, Stage One requires the Court to engage in the familiar process of making factual findings by a preponderance of the evidence, and interpreting and

applying the Guidelines to those facts in order to ascertain the appropriate sentencing guidelines range.

As to Stage Two, the judge must consider the guidelines in conjunction with the other factors enumerated in § 3553(a), in order to determine whether there is any reason to deviate from the guideline range indicated in Stage One. These factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.

Because the Guidelines reflect the Sentencing Commission's considered judgment about all of the factors set forth in § 3553(a), the Supreme Court and the Second Circuit have made it clear that the Guidelines continue to play a central role in a sentencing court's § 3553(a) calculus. Writing for the remedial majority in *Booker*, Justice Breyer explained that sentencing courts, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." 125 S. Ct. at 767. As the Court of Appeals has pointed out, "the excision of the mandatory aspect of the Guidelines does not mean that the Guidelines have been discarded." *Crosby*, 397 F.3d at 111.

> [I] is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after *Booker/Fanfan*, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum. On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a). We

7

> have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice. In short, there need be no "fear of judging."

*Id.* at 114.

In the vast majority of cases, a sentence within the advisory guideline range will be the most effective way of promoting uniform, fair sentencing throughout the nation in compliance with § 3553(a).  This view is shared by Congress and the Supreme Court.  As every Supreme Court justice in the various opinions in *Booker* recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history.  *See, e.g., Booker*, 125 S. Ct. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); *id.* at 759 ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); *id.* at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); *id.* at 785 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").  *See also United States v. Wanning*, 354 F. Supp. 2d 1056, 1059 (D. Neb. 2005) ("The Guidelines and their ranges were explicitly crafted by the Sentencing Commission at the direction of Congress to implement the statutory purposes of sentencing.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of 15 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress.  The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), not least of which are the nature and circumstances of the offense (which are covered thoroughly in Chapters 2 and 3 of

the Guidelines Manual), the history and characteristics of the defendant (which are covered in Chapter 4 with respect to criminal history and Chapter 5 with respect to departures based on the most commonly considered personal characteristics), and the need to provide restitution to victims (Chapter 5, Part E).

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing outlined in § 3553(a), and should occur absent truly unusual circumstances. *See Wanning*, slip op. at 8-9 (concluding that "judges should, in the exercise of their newly minted discretion, normally follow the Guidelines, and the ranges produced by them, because that approach represents the best (though an imperfect) method of sentencing"). The government commends to the Court's attention the scholarly opinions of Judge Cassell in *United States v. Wilson*, 350 F. Supp. 2d 910 (D. Utah 2005) ("*Wilson I*"), and 355 F. Supp. 2d 1269 (D. Utah 2005) ("*Wilson II*"), which reach this same conclusion. As Judge Cassell explained, the Guidelines represent the product of an expert commission which has studied the sentencing process at great length, under the specific mandate of Congress to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to accord with legislatively determined policies. *Wilson* further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. Judge Cassell further observed that the Guidelines provide appropriate guidance, which is fully consonant with legislative policy, as to when particular offender characteristics properly factor into the sentencing calculus -- for example, forbidding consideration of factors such as race, religion, or socioeconomic status, and assigning only modest weight to factors such as family ties, age, and civic contributions. *Wilson II*, 355 F. Supp. 2d at 1275-76. Importantly, Judge Cassell properly concluded that one of the primary goals of the criminal sentencing system is "equal justice under the law -- with a

sentencing statute that mandates similar outcomes for similar crimes committed by similar offenders." *Id.* at 1286. "The only realistic way to insure this is to follow generally the Guidelines." *Id.* For all of these reasons, a court should "give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." *Wilson I*, 350 F. Supp. 2d at 912; *Wilson II*, 355 F. Supp. 2d at 1286-87.

Accordingly, a sentence within the guideline range is presumptively reasonable, and accommodates the congressional purpose set forth in § 3553(a), affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible. The government anticipates that only sentences outside the guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate, absent truly extraordinary circumstances.

**IV.    The Defendant Should Be Sentenced to Period of Imprisonment
Within the Sentencing Guidelines Range for Armed Career Offenders**

This case does not present the rare case in which the Guidelines (including the rules governing departures) fail to produce a sentencing range that fully accords with the various factors set forth in § 3553(a). Accordingly, the government respectfully requests that the Court sentence the defendant to a term of imprisonment within the sentencing guidelines range of 262-327 months as calculated in the PSR based on the defendant's armed career criminal status. In any event, given the Court of Appeals' mandate, the defendant must be sentenced to a term of imprisonment of no less than 180 months under 18 U.S.C. § 924(e). See United States v. Rivera, 04-3769(L), 2005 WL 767437, at * 3 (2d Cir. 2005) (stating that "the ten year sentence imposed by the district court is hereby vacated and remanded for resentencing under 18 U.S.C. § 924(e)"); 18 U.S.C. § 924(e) (providing that person who violates § 922(g) and has three previous convictions for violent felonies "shall be . . . imprisoned not less than fifteen years"); see also United States v. Medley, 313 F.3d 745, 749 (2d Cir. 2002) (district court may depart below statutory mandatory minimum in non-drug case only for substantial assistance).

**Conclusion**

For the foregoing reasons, the government respectfully requests that this Court sentence the defendant to a term of imprisonment within the guidelines range of 262 to 327 months.

                            Respectfully submitted,

                            KEVIN J. O'CONNOR
                            UNITED STATES ATTORNEY

                            /s/
By:   PAUL A. MURPHY
        ASSISTANT U.S. ATTORNEY
        Federal Bar No. CT26654

For:  ERIC J. GLOVER
        ASSISTANT U.S. ATTORNEY
        Federal Bar No. CT23923
        157 Church Street, 23rd Floor
        New Haven, CT  06510
        Tel.: (203) 821-3745
        Fax: (203) 773-5378
        eric.glover@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on June 10, 2005, I caused a true and correct copy of the foregoing Government's Sentencing Memorandum to be sent by first-class United States mail to:

      Paul Thomas, Esq.
      Assistant Federal Defender
      2 Whitney Avenue, Suite 300
      New Haven, CT 06510


         /s/_____
By:   PAUL A. MURPHY
       ASSISTANT U.S. ATTORNEY
For:  ERIC J. GLOVER
       ASSISTANT U.S. ATTORNEY